IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LARRY WOOLARD and ANNE WOOLARD, )
)
Plaintiffs, )
)
v. ) 1:18CV410
)
CARRIER CORPORATION, et al., )
)
Defendants. )

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs Larry and Anne Woolard initiated this asbestos-related personal injury action against fourteen defendants. (ECF No. 75.) As alleged in the amended complaint, Mr. Woolard was exposed to a myriad of asbestos-containing products and equipment "while working as an HVAC apprentice, mechanic[,] and supervisor for Weyerhaeuser Paper Mill in the cities of New Bern and Plymouth, North Carolina" between 1965 and 1978. (*Id.* ¶ 17(d).) He was diagnosed with mesothelioma—a cancer caused by the inhalation of asbestos fibers— on or around March 18, 2018. (*Id.* ¶ 16.)

Before the Court are motions for summary judgment filed by Defendants Fisher Controls International LLC, Schneider Electric Systems USA, Inc., Chicago Bridge & Iron Company, and Chicago Bridge & Iron Company (Delaware) (collectively, the "Moving

Defendants").[1]  (ECF Nos. 126; 128; 130; 135.)  For the reasons stated below, all four motions will be granted.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (quotations omitted).  The role of the court at summary judgment is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In so doing, "the

---

[1] The amended complaint asserts five claims against the Moving Defendants: (1) negligence; (2) product liability—inadequate design or formulation; (3) breach of implied warranty; (4) willful and wanton conduct; and (5) failure to warn.  (*Id.* ¶¶ 27–68.)

2

nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324.

## II. DISCUSSION

To prevail in an asbestos-related product-liability action under North Carolina law,[2] a plaintiff must establish that he was "actually exposed to the alleged offending products." *See Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985). Consistent with that requirement, the Fourth Circuit has further held that a North Carolina asbestos plaintiff "'must prove more than a casual or minimum contact with the product' containing asbestos in order to hold the manufacturer of that product liable." *See Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 & n.2 (4th Cir. 1995) (applying the threshold causation standard outlined in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986), to a North Carolina case). Instead, to support a reasonable inference of substantial causation from circumstantial evidence, a plaintiff must introduce "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."

---

[2] As a federal court sitting in diversity, this Court is bound to apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995); *Boudreau v. Baughman*, 368 S.E.2d 849, 854 (N.C. 1988) ("This Court has consistently adhered to the lex loci rule in tort actions."). Mr. Woolard's alleged exposure to Moving Defendants' products occurred in North Carolina, as did the diagnosis of his mesothelioma. Accordingly, the Court will apply North Carolina's substantive law.

3

*Id.* (quotations omitted). Federal courts have long used this "frequency, regularity, and proximity" test—the "*Lohrmann* test"—to evaluate proximate causation in asbestos cases arising under North Carolina law.

Plaintiffs appear to argue that a modified version of the *Lohrmann* test should be applied in cases involving mesothelioma, as "an occupational history of brief or low level exposure is sufficient" to cause the disease. (*See, e.g.*, ECF No. 150 at 12.) However, this Court recently rejected that argument, *see Connor v. Norfolk S. Ry. Co.*, No. 1:17CV127, 2018 WL 6514842, at *3 n.5 (M.D.N.C. Dec. 11, 2018), and does so again here.[3]

In the main, Moving Defendants contend that, based on the evidence produced during discovery, Plaintiffs cannot meet the threshold causation requirements for actionable asbestos exposure described above. (*See, e.g.*, ECF Nos. 126 at 1; 128 at 1; 130 at 1–2; 135 at 1.) Because the relevant evidence varies according to defendant, the Court will address each of the summary judgment motions separately.

### A. Fisher Controls International LLC

The Court begins with Defendant Fisher Controls International LLC's ("Fisher") motion for summary judgment. (ECF No. 126.) Fisher contends that the record contains "no evidence that [Mr. Woolard] was exposed to any asbestos for which Fisher could be held liable, much less exposure at a level sufficient to satisfy North Carolina causation requirements."

---

[3] Federal courts routinely apply the "frequency, regularity, and proximity" test—as specifically set forth in *Lohrmann* and *Jones*—in mesothelioma cases arising under North Carolina law. *See, e.g., Haislip v. Owens-Corning Fiberglas Corp.*, 86 F.3d 1150 (table), 1996 WL 273686, at *2 (4th Cir. May 23, 1996) (per curiam); *Finch v. BASF Catalysts LLC*, No. 1:16-CV-1077, 2018 WL 4101828, at *4 (M.D.N.C. Aug. 22, 2018); *Starnes v. A.O. Smith Corp.*, No. 1:12-CV-360-MR-DLH, 2014 WL 4744782, at *3 (W.D.N.C. Sept. 23, 2014); *Jandreau v. Alfa Laval USA, Inc.*, No. 2:09-91859-ER, 2012 WL 2913776, at *1 n.1 (E.D. Pa. May 1, 2012).

4

(ECF No. 127 at 1.) It is Plaintiffs' burden to show that the record contains facts from which a reasonable jury could conclude that Mr. Woolard was "actually exposed" to Fisher-attributable asbestos, as required by *Wilder*, and that this exposure occurred with sufficient frequency, regularity, and proximity to satisfy the *Lohrmann* test. *See Young v. Am. Talc Co.*, No. 1:13CV864, 2018 WL 9801011, at *3 (M.D.N.C. Aug. 3, 2018). The Court concludes that Plaintiffs have failed to carry this burden.

The record shows that Mr. Woolard worked at the Weyerhaeuser mill in Plymouth, North Carolina beginning in 1965; first as a mechanic's helper, then as a full-fledged mechanic. (*See* ECF No. 151-1 at 7, 31–32.) Around 1972, he transferred to Weyerhaeuser's mill in New Bern, where he continued working as a mechanic. (*Id.* at 38.) In "[s]omething like" 1974 or '75, Mr. Woolard was promoted to a supervisory position. (*Id.*) He worked as "a manager over the instrument and electrical shop" until he left Weyerhaeuser in 1978. (*Id.* at 7, 38.)

Generally speaking, Mr. Woolard "did a lot of valve work" during his time as a mechanic with Weyerhaeuser. (*Id.* at 7.) If a valve's gasket started to leak, Mr. Woolard or another mechanic would "take [the] unit apart," scrape off the faulty gasket with a chisel ("they were usually stuck to the metal"), and install a replacement gasket. (*Id.* at 7–8.) Depending on the type of gasket—some were made of asbestos, others were not—this process could produce "a lot of dust," which Mr. Woolard inhaled. (*See id.* at 7–8.) Mr. Woolard was also responsible for replacing or reinforcing leaky packing around valves. (*Id.* at 9.) The packing "sometimes" contained asbestos, and its removal "sometimes" created dust. (*Id.* at 9–10.)

A number of different brands of valves were used at the Weyerhaeuser mills, Fisher among them. (*Id.* at 8.) According to Mr. Woolard, "[m]ost of [the Fisher valves]" at the mills

5

were large "globe valves, [with] flanges on each end," though the "smaller ones would maybe be a thread connection." (*Id.* at 71–72.) Mr. Woolard recalls that he "worked on several Fisher valves" in Plymouth, and some in New Bern. (*Id.* at 71.) Specifically, he remembers replacing flange gaskets on Fisher valves attached to large digesters. (*Id.* at 73.)

Taken together, this evidence shows two things: (a) that Mr. Woolard was exposed to asbestos through his work on certain valve gaskets and packing, and (b) that some of the valves he worked on were Fisher valves. What Plaintiffs have failed to establish, however, is a connection between the mills' Fisher valves and Mr. Woolard's asbestos exposure. In fact, as explained below, the record is devoid of evidence showing that any Fisher-affiliated products at the mills contained asbestos.[4]

Plaintiffs assert that "[u]p until 1988, Fisher manufactured valves containing asbestos components." (ECF No. 151 at 5.) This fact is not in dispute. However, if Plaintiffs mean to suggest that *all* or even *most* Fisher valves produced before 1988 contained asbestos, such that it might be reasonable to infer that the Fisher valves at the mills did, too, that inference is not supported by the record. Rather, upon close inspection, the evidence cited by Plaintiffs merely shows that "[p]rior to 1988, *some* of [Fisher's] valves . . . incorporated asbestos-containing components," and whether a valve included asbestos or not "depended solely on the application and customer request." (ECF No. 151-3 at 3 (emphasis added).)

---

[4] Plaintiffs also argue that Fisher should be held liable for injuries caused by asbestos-containing replacement parts used in connection with its valves. (*See* ECF No. 151 at 12–15.) However, there is no evidence in the record that Fisher valves required asbestos-containing parts to operate, that Fisher recommended the use of asbestos components with its valves, or that any replacement parts used with Fisher valves at the mills—whether manufactured by Fisher or a third party—contained asbestos.

6

Of course, it is possible that Weyerhaeuser purchased valves from Fisher containing asbestos components. However, the record is wholly inconclusive on this point. With respect to valve packing, sales receipts and invoices show that Fisher valves that were shipped to Weyerhaeuser during the years Mr. Woolard worked there included "TFE packing." (*See, e.g.,* ECF No. 151-5 at 5, 8.) A Fisher products handbook from the time—which Plaintiffs cite to in support of their claims—describes a variety of packing called "TFE-Impregnated Asbestos." (ECF No. 151-4 at 9.) However, that very same handbook also lists a form of packing called "TFE V-Ring," which did not contain asbestos. (*Id.* at 8.) The Weyerhaeuser sales records do not indicate which of the two forms of TFE packing was ordered. Moreover, an affidavit from Fisher's Program Manager for Engineering Codes and Standards states that "non-asbestos containing Teflon packing was the most commonly used packing in Fisher valves in the 1965 to 1978 timeframe." (ECF No. 127-4 ¶¶ 2–3.) Plaintiffs have offered no additional evidence showing that the TFE packing listed in the sales records contained asbestos, or that the statement from Fisher's representative is disputed.

The evidence that Fisher gaskets may have contained asbestos is similarly lacking. Although Plaintiffs' brief asserts that "Woolard believed he was exposed to asbestos dust he breathed during his work removing and replacing gaskets . . . on Fisher valves," (*see* ECF No. 151 at 4), Mr. Woolard's actual testimony to that effect is general in nature and does not refer to any specific brand of valve—Fisher or otherwise:

> Q: Now, we have talked about valves, we have talked about . . . gaskets on valves.
>
> A: Uh-huh.
>
> Q: And you believe you were exposed to asbestos in those ways, right?

7

> A: That would be my guess, yes.
>
> Q: Well —
>
> A: But I'm not guessing. I know that that dust was there —
>
> Q: Right.
>
> A: — as I scraped it up and breathed. Breathing it in would do exactly what happened to me.

(ECF No. 151-1 at 10.) As noted above, only some valve gaskets at the mills contained asbestos (and therefore generated the dust Mr. Woolard mentioned), whereas others did not. (*See id.* at 8.) Without more, Mr. Woolard's testimony, which describes a general exposure untethered to any specific product, is insufficient to show that the gaskets used in connection with Fisher valves contained asbestos.

Nor can Plaintiffs rely on their experts' testimony to demonstrate actual exposure. In their response brief, Plaintiffs state that "expert industrial hygienist Kenneth Garza testified that Woolard had significant asbestos exposure . . . from Fisher valves."[5] (ECF 151 at 6.) However, that is a mischaracterization. A review of Mr. Garza's testimony reveals that his opinion as to Fisher was formulated in response to hypothetical questioning:

> Q: *If the evidence in this case* is that Mr. Woolard worked hands-on with and also around Fisher valves . . and removed asbestos-containing packing [and gaskets] . . . on a regular basis, do you have an opinion as to whether or not that type of exposure would have been significant to Larry Woolard, that type of asbestos exposure?
>
> A: I would consider that significant.

---

[5] Plaintiffs also cite to the expert reports of Drs. John Maddox and Edwin Holstein, (ECF No. 151 at 6–7), who both opine that Mr. Woolard developed mesothelioma due, in part, to asbestos exposure incurred at the Weyerhaeuser mills, (*see* ECF Nos. 151-10 at 2, 4; 151-11 at 8–9). However, as it relates to Fisher, specifically, and the issue of actual exposure, these reports add nothing beyond the facts discussed above.

8

(ECF No. 152-20 at 97–98 (emphasis added).) According to Mr. Garza, *had* Mr. Woolard been regularly exposed to Fisher-attributable asbestos, that exposure would have "increase[d] the risk of mesothelioma." (*Id.* at 98.) The evidence in the record, however, simply does not support the premise that Mr. Woolard was regularly exposed to Fisher-attributable asbestos.

In short, Plaintiffs have failed to demonstrate that Mr. Woolard was "actually exposed" to Fisher-attributable asbestos during his time with Weyerhaeuser. *See Wilder*, 336 S.E.2d at 68. Accordingly, Fisher is entitled to summary judgment on all of Plaintiffs' claims against it.

### B. Schneider Electric Systems USA, Inc.

Next, the Court turns to Defendant Schneider Electric Systems USA, Inc.'s ("Foxboro") motion for summary judgment.[6] (ECF No. 128.) In their amended complaint, Plaintiffs allege that Mr. Woolard was exposed to Foxboro-attributable asbestos while working as a mechanic at Weyerhaeuser. (*See* ECF No. 75 ¶ 17(d).) However, Plaintiffs have failed to come forward with any record evidence showing that Mr. Woolard encountered Foxboro products—whether asbestos-containing or not—at the mills.

Mr. Woolard did not mention Foxboro at all during his deposition, and there is no indication that his general testimony covers instrument features specific to (and therefore capable of identifying) Foxboro products. A second fact witness, Robert Barnes—who worked with Mr. Woolard from 1974–78—did recall seeing Foxboro machinery at the New Bern Mill. (*See* ECF No. 152-2 at 4–5, 17.) However, Mr. Barnes never actually witnessed Mr. Woolard working around a Foxboro valve. (*Id.* at 17–18.) Instead, Mr. Barnes merely stated his belief that Mr. Woolard must have worked on Foxboro valves "before he became

---

[6] Formerly known as Invensys Systems, Inc., and as The Foxboro Company.

[a manager]," presumably because Foxboro was the brand name Mr. Barnes "used to hear mainly" about at the mill. (*Id.* at 18.) That testimony is too vague and speculative to establish actual exposure. *Cf. Connor*, 2018 WL 6514842, at *5–6 (holding that testimony that decedent "would have been" around asbestos removal was too vague to withstand summary judgment). However, even assuming that Mr. Woolard had some interaction with Foxboro valves, Mr. Barnes's testimony offers no evidence from which one could determine the frequency or regularity of that exposure. The evidence is therefore insufficient to satisfy either *Wilder* or *Lohrmann*; accordingly, the Court will grant Foxboro's motion for summary judgment.

## C. Chicago Bridge & Iron Company

The Court now turns to Defendant Chicago Bridge & Iron Company's ("CB&I") motion for summary judgment. (ECF No. 130.) The record shows that seven digesters built by CB&I were purchased for use at Weyerhaeuser's New Bern mill in 1968. (*See* ECF Nos. 132-4 at 1; 144-1 at 23–24.) CB&I did not outfit those digesters with any asbestos-containing materials; when they left CB&I's hands, they were entirely asbestos free. (ECF Nos. 134-5 ¶ 5; 144-1 at 75.) However, Mr. Woolard believes that asbestos-containing valves, gaskets, packing, and insulation—manufactured and supplied by entities other than CB&I—were used in conjunction with the digesters.[7] (*See* ECF No. 150-1 at 67.) Per his testimony, Mr. Woolard worked directly with gaskets and valves attached to the digesters, (*see id.* at 73), and was exposed to dust from the digesters' insulation as a bystander, (*id.* at 12–13).

---

[7] Asbestos-abatement plans obtained from Weyerhaeuser appear to confirm that the digesters and their connecting lines were insulated with asbestos-containing thermal material. (*See* ECF Nos. 150-13 at 94; 150-15.)

10

North Carolina's appellate courts have not yet spoken on whether a defendant-manufacturer can be held liable for injuries arising from the use of a third party's asbestos-containing component in connection with its product. This Court has previously reasoned that *Lohrmann*'s requirement that a plaintiff come forward with "evidence of exposure to a *specific product*" precludes a finding of causation based solely on exposure to third-party asbestos. *See Young*, 2018 WL 9801011, at *4 (citing *Lohrmann*, 782 F.2d at 1162–63). Relatedly, the Western District has interpreted North Carolina's products liability statute as barring liability for mesothelioma caused by third-party components substituted into a defendant's product. *See Harris v. Ajax Boiler, Inc.*, No. 1:12-cv-00311-MR-DLH, 2014 WL 3101941, at *6 (W.D.N.C. July 7, 2014). However, contrary to those decisions, Plaintiffs argue that "North Carolina's appellate courts would more likely adopt" the view that CB&I is liable for "exposures to asbestos-containing parts associated with its digesters"—even those CB&I did not manufacture, sell, or distribute—so long as "it was foreseeable and intended that asbestos materials would be used with [CB&I's] equipment." (*See* ECF No. 150 at 16.)

Even under Plaintiffs' preferred standard, the record is devoid of evidence showing that it was "foreseeable and intended" that asbestos-containing insulation, gaskets, valves, or packing would be used with CB&I's digesters at the New Bern mill. In an affidavit, CB&I's claims manager has stated that "[a]sbestos-containing materials . . . were not required or needed for the digesters to operate properly" and, further, that CB&I did not "specify, require, or recommend asbestos-containing materials . . . be used on the digesters, or on anything that might have some relation to the digesters." (ECF No. 134-5 ¶¶ 7–8.) Plaintiffs have not produced any evidence showing otherwise.

11

In sum, there is no evidence that CB&I's digesters at the New Bern Mill contained asbestos, and to the extent asbestos-laden third-party components were used in connection with the digesters, there is no evidence that such use was intended by CB&I or reasonably foreseeable. Accordingly, CB&I is entitled to judgment as a matter of law.

### D. Chicago Bridge & Iron Company (Delaware)

Finally, the Court addresses the summary judgment motion made by Defendant Chicago Bridge & Iron Company (Delaware) ("CB&I (DE)"). (ECF No. 135.) CB&I (DE)—distinct and separate from CB&I—"was created to hold corporate type employees . . . [such as those working in] the legal department, accounts payable, accounts receivable, [and] accounting . . . that would be utilized by a variety of companies" in the broader "CB[&]I family." (ECF No. 145-1 at 7.) In support of its motion, CB&I (DE) contends that it "did not have anything whatsoever to do with the seven digesters that were at the Weyerhaeuser New Bern [mill]," or, for that matter, any other products Mr. Woolard may have encountered. (*See* ECF No. 145 at 3.)

Plaintiffs seem to have recognized that CB&I (DE) has no place in this suit; they have not filed a response brief, and the motion appears uncontested. Because there were no products attributable to CB&I (DE) at any of Mr. Woolard's worksites, CB&I (DE) is entitled to judgment as a matter of law. Thus, its motion will be granted.

### III. CONCLUSION

Based on the foregoing, the Court concludes that Plaintiffs have failed to introduce evidence of Mr. Woolard's exposure to asbestos-containing products attributable to Defendants Fisher, Foxboro, or CB&I "on a regular basis over some extended period of time

12

in proximity to where [Mr. Woolard] actually worked"—if such exposure occurred at all. *See Jones*, 69 F.3d at 716; *Lohrmann*, 782 F.3d at 1162–63. Further, there is a complete lack of evidence in the record showing that CB&I (DE) is liable. Plaintiffs have thus failed to establish causation as to each of these named Defendants, and, therefore, each is entitled to judgment as a matter of law on all of Plaintiffs' claims against them.

For the reasons stated herein, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that the Motions for Summary Judgment filed by Defendants Fisher Controls International LLC, Schneider Electric Systems USA, Inc., Chicago Bridge & Iron Company, and Chicago Bridge & Iron Company (Delaware), (ECF Nos. 126; 128; 130; 135), are GRANTED. Plaintiffs' claims against each of the Defendants named herein are hereby DISMISSED.

This, the 21st day of May 2020.

/s/Loretta C. Biggs
United States District Judge

13

Case 1:18-cv-00410-LCB-JEP   Document 157   Filed 05/21/20   Page 13 of 13